Filed 3/25/25  P. v. Cheng CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMBAN CHENG,<br><br>    Defendant and Appellant. | C099399<br><br>(Super. Ct. Nos. STKCRFE19960016394, SP060461B) |

Defendant Samban Cheng is serving 25 years to life in prison after pleading guilty to first degree murder for the shooting death of the victim during an attempted carjacking. He appeals the trial court's denial of his petition for resentencing under Penal Code section 1172.6 following an evidentiary hearing in which the court found that defendant

1

could still be convicted of murder because he was a major participant in the offenses and acted with reckless indifference to human life.[1]

On appeal, defendant argues insufficient evidence supports the trial court's major participant and reckless indifference findings. Finding no merit to these contentions, we affirm the order denying defendant's section 1172.6 petition.

## I. BACKGROUND

*A.     The Charges, Defendant's Plea, and Sentencing*

In 1996, defendant and codefendant Anouthinh Pangthong were jointly charged with the murder (§ 187) and attempted carjacking (§§ 664/215, subd. (a)) of Doug Thornton. It was alleged that the murder was committed during a robbery or attempted robbery (§ 190.2, subd. (a)(17)). For both offenses, it was alleged that Pangthong personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)), and, as to defendant, that a principal was armed with a firearm (§ 12022, subd. (a)). Defendant, who was 17 years old at the time of the crimes, was found unfit for juvenile court and was tried as an adult.

In November 1996, defendant pled guilty to first degree murder.[2] The prosecutor dismissed the attempted carjacking count, the court struck all enhancements, and the following month, the court sentenced defendant to 25 years to life in prison.

---

[1] Undesignated statutory references are to the Penal Code. Defendant filed his resentencing petition under former section 1170.95. Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6, with no relevant change. (Stats. 2022, ch. 58, § 10.) For ease of reference, we cite to section 1172.6 throughout this opinion.

[2] Codefendant Pangthong also pled guilty to first degree murder and the remaining counts and enhancements were dismissed. Pangthong received 25 years to life in prison.

During the plea hearing, counsel stipulated to the preliminary hearing transcript as the factual basis for defendant's plea. The evidence at the preliminary hearing showed the following:

Thirteen-year-old George Onesavanh, who was also charged with Thornton's murder but agreed to plead guilty to being an accessory to an attempted carjacking, testified that on March 18, 1996, he was hanging out at the Tyrol Village apartments in Stockton with Lonely (later identified as defendant), Joker (later identified as codefendant Pangthong), Toddler (Onesavanh's cousin Chentra), Bullet (Onesavanh's other cousin Chamrearn), and Ricky. At the time, Onesavanh was an admitted Loc Town Crip gang member.

According to Onesavanh, the group left the apartments to look for cars to "steal" to "go cruising." Defendant had a .22-caliber revolver, which was operable, and Pangthong had a .357 revolver, which did not work. Defendant gave the working gun to Pangthong and took the gun that did not work. The group walked to a nearby 7-Eleven convenience store, and, as they stood near the parking lot, Thornton drove his red truck in and parked. Pangthong asked the group if they wanted to carjack the red truck, and they all responded, "go ahead." Pangthong then told the group what he was going to do if "he be move or try – like don't – like move or try to run or something, he's going to shoot them."

Onesavanh and Ricky broke off from the group and went to a nearby alley while the others walked towards the red truck.[3] Onesavanh heard one gunshot. Onesavanh and Ricky then left and went back to the Tyrol Village apartments where he met up with defendant, Pangthong, Toddler, and Bullet. Pangthong said he had "shot that dude."

---

[3] This testimony contradicted Onesavanh's earlier statement to police claiming that he was at the red truck when Thornton was shot.

3

Pangthong told Onesavanh that he had asked the victim for his keys and then shot him when Thornton refused. Thornton died from a single bullet wound to the head.

D. Avery was with Thornton at the time of the shooting. Avery waited in the passenger seat of Thornton's red truck while Thornton went inside the convenience store. While he waited, he saw four Asian males between the ages of 15 and 20 walk past the truck, stop and talk, and then walk back towards the truck and out of sight. Thornton returned to the truck to grab something and then walked back towards the store. As Thornton passed the front left side of the truck, Avery heard someone say, "give me your keys." Thornton looked back, but kept walking; Avery heard Thornton say, " 'what,' " like "what do you mean," and then saw one of the Asian males raise his arm and shoot Thornton in the back of the head. The group of males ran off as Avery tried to tend to Thornton. Avery later identified defendant in a photographic lineup, saying he was present and was standing next to Thornton when the shooting occurred, although Avery could not recall if he was the shooter.

Another eyewitness told officers that he heard a loud pop and saw four Asian males running in the direction of the Tyrol Village apartments. And Pangthong's brother, although he denied it during the preliminary hearing, told officers that Pangthong had claimed to have shot someone in the back of the head at a 7-Eleven and killed him.

B. *Petition for Resentencing*

In 2022, defendant petitioned for resentencing under section 1172.6, asserting he could no longer be convicted of murder after changes made by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) to sections 188 and 189. The People filed an informal response to the petition, but the brief is not included in the record.

In a reply brief, defendant argued that he had made a sufficient prima facie showing because he was convicted as an aider and abettor on a felony-murder theory and he did not intend to kill, was not a major participant in the crimes, and did not act with reckless indifference to human life as those factors had been clarified by our Supreme

4

Court in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). He claimed he was youthful when he agreed to participate in the planned carjacking and did not expect anyone to be harmed. While he did give Pangthong the weapon used to kill Thornton, the shooting happened quickly, and he had no opportunity to stop it.

At a hearing in March 2023, the trial court found defendant had made a prima facie showing. The court issued an order to show cause and set the matter for an evidentiary hearing.

In May 2023, the prosecution filed a formal opposition brief, arguing defendant could still be convicted of murder under current law because he was a major participant who acted with reckless indifference to human life. The prosecutor cited the preliminary hearing transcript, the probation report, a July 2016 parole hearing transcript, and a parole comprehensive risk assessment. The prosecutor also asked the court to take judicial notice of the preliminary hearing transcript, the change of plea transcript, the information, the probation officer's report, and all other records in defendant's case.

During the parole hearing, defendant, who was then 37 years old, said he was introduced to gang culture at a young age by his older brother, who was eventually killed from gang violence. On the day Thornton was killed, defendant was hanging out with a bunch of guys when someone in the group said that a cousin wanted a ride to go get some guns. Although defendant already had a working gun, he saw this as an opportunity to boost his reputation in the gang, so he agreed to help steal a car in exchange for getting a second gun. Defendant gave his loaded .22-caliber revolver to Pangthong because Pangthong wanted to be the shooter when taking the car, and Pangthong gave defendant a .357 revolver that did not have a firing pin. Pangthong had previously told defendant that he had used the .357 revolver to rob a man near a grocery store.

As the group passed the 7-Eleven, they saw Thornton's red truck and Pangthong said he wanted it; according to defendant, he told Pangthong not to do it because the

5

truck was out in the open, but Pangthong did not hear him. When Thornton emerged from the 7-Eleven, Pangthong asked him for a smoke and Thornton gave him one. Pangthong then asked for a light and as Thornton reached to get a lighter, Pangthong pointed defendant's loaded gun at him and demanded his truck. Defendant stood nearby with Pangthong's inoperable gun in his waistband. Defendant thought he saw the passenger in Thornton's truck reaching for something under the seat that appeared to be a gun, so defendant pulled out the inoperable gun and pointed it at the passenger. He heard Thornton say something like, "don't do this," and then saw Thornton turn and run. Pangthong shot Thornton in the back of the head.

Although a police report stated that during the initial investigation, defendant had caused some confusion because he was telling people that he was responsible for the shooting to gain respect for self-protection, during the parole hearing defendant denied ever telling anyone that he was the "actual shooter" as a means of gaining respect in his gang. He admitted that he associated with gang members, committed crimes, and terrorized the community, because he had no regard for others. He continued to hang out with gang members in prison from age 17 to 34. He denied being under the influence of alcohol or other substances at the time of the crime.

When a parole commissioner asked defendant why he gave his loaded gun to Pangthong and why it was necessary to carry a loaded weapon to rob someone of their car, defendant responded that they were going to kill the victim, no matter who he was. The commissioner then asked if the plan was to "intentionally kill" the victim and defendant responded, "Yes, sir." Defendant acknowledged that "the intent all along" was "[t]o carjack and kill."

On September 5, 2023, the trial court held an evidentiary hearing on defendant's section 1172.6 petition. Over defense counsel's objection, the court admitted the preliminary hearing transcript, the parole hearing transcript, and the parole risk assessment as evidence.

Based on that evidence, the prosecution argued that although Pangthong had shot and killed Thornton, the evidence showed defendant was a major participant who acted with reckless indifference to human life during the attempted carjacking and killing. Defendant supplied the loaded murder weapon to Pangthong, was present at the scene of the shooting, pointed a gun at Thornton's passenger during the incident, failed to render aid to Thornton while he lay dying, later claimed that he was the actual shooter, and, during a subsequent parole hearing, admitted that he knew the group's plan was to carjack and kill whoever he and his cohorts selected as their victim.

Defendant testified on his own behalf at the evidentiary hearing. Defendant admitted that at the time of the incident he was in a gang. The day of the shooting, he was hanging out with several other gang members, including Ricky, Bullet, and Pangthong about two blocks from the 7-Eleven where Thornton was shot. Someone showed up and told the group his cousin wanted to pick up some guns in Lodi. Defendant and the others planned to find a car to steal to give the cousin a ride to Lodi to retrieve the guns. In exchange for obtaining the car, the cousin was supposed to give defendant more guns.

Contrary to his parole hearing testimony, defendant denied that there was ever an intent to shoot and kill anyone during the planned carjacking. He claimed he only told the parole board that the plan was to carjack and kill the selected victim because he wanted the parole board to believe he was taking accountability for the crime and not minimizing his role, making it more likely that the parole board would not automatically deny him parole. Defendant also claimed that Onesavanh lied during his preliminary hearing testimony.

7

Defendant admitted giving Pangthong a loaded and operable firearm.[4]  Defendant knew the gun worked because he had fired it a few days prior to the killing.  According to defendant, he had only known Pangthong for about a week before the murder, and he was not aware that Pangthong had used guns.  At the time, Pangthong was about 14 years old, and defendant was the oldest of the group at 17.

Defendant further testified that as they waited for Thornton to emerge from the 7-Eleven, he told Pangthong not to go through with the carjacking.  Defendant initially testified that he stood near the truck behind Pangthong and saw Thornton reach for something under the seat, but later said it was actually the passenger and not Thornton who reached for something under the seat.  He said he tried to scare the passenger by pulling out the gun.  After Pangthong shot Thornton, defendant froze in shock while everyone else ran off; he stood near the body and then fled with the others.  He admitted that he never called anyone to help Thornton.  Defendant testified that he did not expect Pangthong to shoot and kill Thornton, although he was sober and knew exactly what was going on.  Defendant denied that he had ever bragged about being the shooter.

At the conclusion of defendant's testimony, defense counsel conceded defendant was a major participant in the crimes, but argued that the only real evidence that showed defendant acted with reckless indifference to human life was his testimony to the parole board that the group always planned and intended to kill the carjacking victim.  Counsel urged the court to disregard the parole testimony given that defendant said he lied about the intent to kill plan to increase his chance of being paroled.  He asserted Thornton was shot in a store parking lot where others were present to provide aid, and that defendant had only known Pangthong a short time and did not expect him to kill Thornton.

---

[4]  According to defendant, Pangthong initially gave his inoperable .357-caliber gun to Bullet and then asked defendant for his working .22-caliber gun; defendant gave Pangthong his gun, and then defendant asked Bullet for the .357 gun.

8

After considering the evidence, the trial court denied defendant's section 1172.6 petition. The court found, based on defendant's parole hearing testimony, as well as on the circumstantial evidence and defendant's own testimony at the evidentiary hearing, that defendant was a major participant and acted with reckless indifference to human life. In so ruling, the court noted that defendant provided Pangthong with the loaded weapon used to kill Thornton and pulled out his own weapon and pointed it at Thornton's passenger thereby raising the stakes during the deadly attempted carjacking.

Defendant timely appealed.

## II.  DISCUSSION

*A.      Senate Bill 1437 and Standard of Review*

Senate Bill 1437 amended the felony-murder rule and the natural and probable consequences doctrine, as it relates to murder, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  Senate Bill 1437 achieved these goals by amending section 188 to require that a principal act with express or implied malice (§ 188, as amended by Stats. 2018, ch. 1015, § 2), and by amending section 189 to state that a person can be liable for felony murder only if:  (1) the "person was the actual killer"; (2) the person, with an intent to kill, was an aider or abettor in the commission of murder in the first degree; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life."  (§ 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 3.)

Where, like here, the trial court issues an order to show cause and holds an evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the defendant is guilty of murder under California law as amended by the changes to section 188 or 189 made effective by Senate Bill 1437.  (§ 1172.6, subd.

9

(d)(3).) The parties may offer evidence from a prior trial, or new or additional evidence at the hearing. (*Ibid.*)

We review the denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finders' findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We examine " 'the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Pham* (2009) 180 Cal.App.4th 919, 924-925.)

B.      Banks/Clark *Factors*

When "Senate Bill 1437 amended . . . section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*." (*People v. Strong* (2022) 13 Cal.5th 698, 710.)

*Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks, supra*, 61 Cal.4th at p. 794.) The high court identified various factors that should be considered in making the determination, including: "What role did the defendant having in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying

10

or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)

The *Banks* court recognized that "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Banks, supra*, 61 Cal.4th at p. 803.)  Instead, all of the factors "may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' "  (*Ibid.*; see also *Tison v. Arizona* (1987) 481 U.S. 137, 139-142, 151-152 [brothers who helped break father and cellmate out of prison and who helped flag down a car with a family of four who father and cellmate later murdered played a significant role in crimes and could have foreseen that their actions created a grave risk of death]; *Enmund v. Florida* (1982) 458 U.S. 782, 784-785, 788 [defendant who drove accomplices to the victims' home for armed robbery during which he remained in the car could not constitutionally be sentenced to death where driver did not kill, attempt to kill, or intend that a killing take place during the robbery and he was not present when the killing took place].)

Applying these factors, the *Banks* court found the evidence was insufficient to show the defendant there—a getaway driver for an armed robbery of a medical marijuana dispensary—was a major participant, where there was no evidence establishing his role in planning the robbery or procuring weapons, and no evidence he was present for the robbery or played a role in instigating the shooting.  (*Banks, supra*, 61 Cal.4th at pp. 794-795, 805, 807-808.)

Our Supreme Court considered the "reckless indifference" element in *Clark*. (*Clark, supra*, 63 Cal.4th at pp. 614-623.)  Reckless indifference to human life is

" 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.)

Recklessness has both a subjective and an objective component. (*Clark, supra*, 63 Cal.4th at p. 617.) Subjectively, the defendant must consciously disregard risks known to him. (*Ibid.*) Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*) The fact that a robbery involved a gun or carried a risk of death is insufficient, by itself, to support a finding of reckless indifference. (*Id.* at pp. 617-618; see also *In re Scoggins* (2020) 9 Cal.5th 667, 677 [" 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life"].)

*Clark*, like *Banks*, identified various factors to be considered in determining whether the defendant acted with reckless indifference. (*Clark, supra*, 63 Cal.4th at pp. 618-623.) These include: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins, supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark, supra*, at pp. 618-623].) Applying these factors, the *Clark* court found the evidence was insufficient to show the defendant acted with reckless indifference to human life in the armed robbery of a computer store, where he planned the robbery but was not armed or physically present

12

in the store when the victim was shot, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present and using an unloaded gun.  (*Clark, supra*, at pp. 611, 618-623.)

The Supreme Court has repeatedly emphasized that no one of the above major participant or reckless indifference factors is necessary, nor is any of them necessarily sufficient.  (*Banks, supra*, 61 Cal.4th at p. 803; *Clark, supra*, 63 Cal.4th at p. 618.)  With these concepts in mind, we turn to defendant's evidentiary challenge.

C.      *Sufficiency of the Evidence*

Defendant contends insufficient evidence showed he was a major participant in the attempted carjacking and killing or that he acted with reckless indifference to human life during the crimes.  We are not persuaded.

1.      *Major Participation* (Banks)

At the outset, we note that defendant's argument on appeal that he was not a major participant under *Banks*, contradicts defense counsel's concession below that defendant *was* a major participant in the crimes.  Even if we were to disregard the concession, however, sufficient evidence shows defendant helped plan and agreed to the crime, supplied the lethal weapon used during the attempted carjacking, used a second gun during the incident to help further facilitate the crimes, knew the weapon he gave Pangthong was operable and loaded, and was present at the scene and did nothing to help Thornton either before or after he was shot; instead fleeing with the others to avoid detection.  (See *Banks, supra*, 61 Cal.4th at pp. 794-795, 805, 807-808.)

We reject defendant's contention that little weight should be given to his sworn parole testimony that the group always planned to carjack *and kill* the selected target, even if it is admissible.  (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 586, 590.)  The trial court, as the trier of fact at the evidentiary hearing (§ 1172.6, subd. (d)), was free to discount defendant's conflicting testimony during the evidentiary hearing that he only said the group intended to kill the victim at the parole board hearing in hopes of securing

13

parole. (Cal. Code Regs., tit. 15, § 2281, subd. (d)(3) [parole board shall consider signs of remorse, including that a defendant understands the "nature and magnitude of the offense"].) Notably, at the time of the parole hearing defendant was 37 years old, and he swore to tell the truth at the hearing. The trial court reasonably could conclude that defendant, as an adult who had matured over time, told the truth at the parole hearing and that he only now at the evidentiary hearing changed his testimony to improve his chances of having his murder conviction vacated after parole had already been denied.

To the extent defendant argues that no other evidence supports his statements at the parole hearing that the group planned to kill their selected victim, we disagree. Based on Onesavanh's preliminary hearing testimony, the trial court reasonably could find that, before approaching Thornton's truck, Pangthong told the group that, if Thornton moved or tried to run, he intended to shoot him. Defendant was present for this conversation, and no evidence showed he objected to Pangthong's statement. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1115 ["Evidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as that effect is relevant to an issue in dispute"].) Such evidence thus supports the reasonable inference that the group did in fact plan to kill their intended victim just as defendant testified at the parole hearing.

The remaining evidence satisfies several of the *Banks* factors, which further supports our conclusion that the trial court did not err in finding defendant was a major participant in the underlying crimes. For the first *Banks* factor, we look to defendant's role in planning the criminal enterprise. (*Banks*, *supra*, 61 Cal.4th at p. 803.) Here, defendant himself admitted that he agreed to participate in the planned carjacking to steal a car for someone's cousin so that they could drive to Lodi to retrieve weapons, thereby gaining respect from other gang members and additional guns for himself. Before leaving the apartments in search of a victim, Pangthong asked defendant for defendant's loaded, operable gun and defendant gave it to him knowing that Pangthong wanted to be

14

the "shooter" during the carjacking. Pangthong had told defendant he had used the gun he traded with defendant in an earlier robbery near a grocery store. Despite defendant's parole hearing testimony that he told Pangthong not to carjack Thornton because the red truck was out in the open, there was contradictory evidence that when the group stopped at the 7-Eleven and Pangthong picked Thornton's red truck to carjack, everyone in the group—including defendant—agreed on the selected target. From this evidence, a rational trier of fact could reasonably infer that defendant played an integral part in the planning and execution of the attempted carjacking, which led to Thornton's murder. Contrary to defendant's contention, then, the first *Banks* factor weighs in favor of defendant being a major participant.

Defendant concedes substantial evidence supports the trial court's finding that the second *Banks* factor—supplying or using lethal weapons—was present. We agree. Defendant admitted he gave Pangthong a loaded gun that he knew worked since he had shot the gun days earlier. And defendant used the gun that Pangthong had given him during the attempted carjacking. Although defendant did not fire the weapon, he pointed it at Thornton's passenger, presumably to scare him and prevent him from intervening on Thornton's behalf.

For the third *Banks* factor, we consider defendant's awareness of the dangers posed by the nature of the crime, the weapons used, or the past experience or conduct of the other participants. (*Banks, supra*, 61 Cal.4th at p. 803.) The trial court implicitly found that defendant was aware of the danger posed by the armed carjacking, and substantial evidence and reasonable inferences from the evidence support this implied finding.

Before walking over to Thornton's truck, the trial court could reasonably find, based on the preliminary hearing testimony, that Pangthong announced his intention to shoot the driver if he resisted or attempted to run away. Having been present for this conversation, defendant then accompanied Pangthong and two others over to the truck

15

and stood behind Pangthong as reinforcement. When Pangthong demanded Thornton's truck and pulled out the loaded gun and pointed it at him, defendant pulled out his gun and pointed it at Thornton's passenger to prevent him from grabbing something that might have helped Thornton. There was also evidence that, although defendant may not have known Pangthong long, he had learned that Pangthong had, in a prior robbery, used the firearm he provided to defendant during the attempted carjacking. And, as previously noted, Pangthong had specifically asked defendant for his loaded, operable weapon because he wanted to be the "shooter" during the carjacking. Defendant thus was aware of Pangthong's propensity to use a firearm to rob and steal from innocent victims, and that he intended to be the shooter during the planned carjacking.

The fact that the group did not capture, bind, or take Thornton to a remote location, as occurred in other cases defendant cites (see e.g., *Tison v. Arizona, supra*, 481 U.S. at pp. 139-141 [victims captured, removed to remote location and then executed]; *People v. Montanez* (2023) 91 Cal.App.5th 245, 285 [participants captured multiple victims, bound and robbed them, detained them for several minutes, and sexually assaulted the female victim]), does not mean defendant was unaware of the dangers posed by the nature of the crimes here.

Similarly, defendant's reliance on a multitude of other cases with diverse facts also does not compel a conclusion that insufficient evidence supports the trial court's findings. "When we decide issues of sufficiency of the evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) In any event, contrary to the record here, the defendant in *In re Ramirez* (2019) 32 Cal.App.5th 384, stayed behind while his cohort committed the actual robbery and there was no indication that he knew his cohort would kill. (*Id.* at pp. 390-391, 404-405.) In *In re Bennett* (2018) 26 Cal.App.5th 1002, there was no indication that the defendant knew his compatriots were dangerous and he waited across the street while the robbery took place. (*Id.* at pp. 1020-1021.) Here, by contrast,

16

defendant was present and participated in the attempted carjacking, knew that Pangthong was armed with a loaded and operable firearm that defendant had given him, knew that Pangthong said he was willing to fire the gun if they met any resistance, and defendant himself used a gun to help facilitate the attempted carjacking and support Pangthong.

For the fourth *Banks* factor (presence at the scene and in a position to facilitate or prevent the killing) (*Banks, supra*, 61 Cal.4th at p. 803) defendant was standing mere feet from Pangthong when he fired the fatal shot. At the time, defendant had drawn his weapon to hold Thornton's passenger at bay, helping further facilitate the carjacking and killing. No evidence showed that defendant told Pangthong to stop or drop his weapon. This evidence supports a finding that defendant's presence at the scene and actions during the incident were more than minor.

For the final *Banks* factor, we focus on what defendant did after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) After Thornton was shot, defendant did not render aid or otherwise help the dying man. Instead, he fled with the others. There was also evidence, although disputed, that he bragged about being the actual killer to gain respect in his gang.

Based on the totality of the circumstances and viewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supports the trial court's finding that defendant was more than a passive participant in the attempted carjacking and killing. (*Banks, supra*, 61 Cal.4th at p. 803 [not all *Banks* factors are necessary to find a defendant acted as a major participant during a felony murder].)

Defendant's youth at the time of the crimes does not compel a contrary finding. While it is true that both defendant and Pangthong were relatively young at 17 and 14 years of age, respectively, and some courts have found that youthfulness is a proper consideration under *Banks* and *Clark* (see e.g., *In re Harper* (2022) 76 Cal.App.5th 450, 467-468 [citing cases]), the evidence here shows that defendant, who was the oldest in the group, was well aware of the dangers posed by using loaded firearms during criminal

17

activities as his own brother had been killed in a gang-related shooting, something that defendant said deeply impacted him. (*Id.* at pp. 470-471 [noting that prior court found the nearly 17-year-old defendant " ' "certainly had an appreciation for the risks and consequences of what goes on in a criminal behavior, because one of his very best friends was killed at age 14 in a drive-by shooting, and he said he missed his friend greatly" ' "].) Thus, he did not lack the experience, perspective, or judgment to adequately appreciate the risk of death posed by a person with a loaded gun who told him he wanted to be the "shooter" during the planned carjacking and then subsequently announced in defendant's presence *his intention to in fact shoot the victim* if he resisted.

And, despite defendant's contentions, we do not interpret the absence of any reference to defendant's youthfulness when the trial court ruled to mean that the court failed to consider his youth and immaturity at the time of the shooting when making the major participant and reckless indifference determinations. Defendant himself repeatedly raised the youthfulness issue below and nothing shows the trial court did *not* consider the issue. "Absent evidence to the contrary, we presume that the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)

But even if we assume, for the sake of argument, that the trial court's silence indicates it failed to consider defendant's youthfulness as defendant alleges, we find any error harmless. In *In re Harper, supra*, 76 Cal.App.5th at pages 470-472, for example, the appellate court found that even if the nearly 17-year-old defendant's youth at the time of a murder committed by his two accomplices during a store robbery could properly be considered as decreasing his culpability under *Banks* and *Clark*, that factor in no way undermined its conclusion that the defendant was a major participant who acted with reckless indifference to human life. The youthful defendant in *Harper* willingly chose to participate in the robbery, was aware of the accomplice's violent tendencies, supplied the gun to the shooter, told the other accomplice who slit the victim's throat where to retrieve

18

a knife during the incident, stole money from the cash register, provided no aid to the victim after hearing the gunshot, and then later bragged about the crimes. (*Ibid.*)

The same rationale applies here. Much like the defendant in *In re Harper*, defendant willingly participated in the attempted carjacking to increase his gang reputation and to obtain more firearms. He knew what was going to occur if the group's intended victim resisted—that Pangthong would shoot him. He was aware that Pangthong's gun was operable and loaded because defendant actually gave Pangthong the weapon to use as the "shooter." Instead of objecting when Pangthong announced his intention to shoot the victim before the group approached the truck, defendant said nothing. During the attempted carjacking, defendant even pulled out a second gun and pointed it at Thornton's passenger who appeared to be reaching for something that might have helped Thornton. Defendant fled after Thornton was shot in the head, offering no aid, and then, according to police, later bragged about being the shooter to boost his reputation in his gang. And defendant admitted during the parole hearing that the group always intended to kill the selected victim. On this record, we cannot say defendant's youth precluded him from being a major participant in the crime.

>    2.    *Reckless Indifference to Human Life* (Clark)

There is a recognized overlap between being a major participant and having a reckless indifference to human life. As our Supreme Court acknowledged in *Clark*, " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark, supra*, 63 Cal.4th at p. 615.) Applying the *Clark* factors, we conclude the totality of the record contains sufficient evidence from which the trial court could conclude beyond a reasonable doubt that defendant acted with reckless indifference to Thornton's life.

While evidence of the third *Clark* factor relating to the duration of the felony was absent, since the evidence showed the group shot Thornton shortly after approaching his truck in the 7-Eleven parking lot (*Clark, supra*, 63 Cal.4th at p. 620), substantial evidence

19

of the remaining *Clark* factors was presented below. (*Id.* at pp. 619-622.) The first *Clark* factor (knowledge of weapons and use and number of weapons) (*id.* at p. 618) favors finding defendant recklessly disregarded Thornton's life during the crime. While the mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference, it is significant that defendant gave Pangthong the loaded weapon used to kill Thornton, which defendant knew worked since he had previously fired the gun. Moreover, defendant brought another gun to the carjacking, which he pointed at Thornton's passenger to prevent him from intervening. "A defendant's *use* of a firearm, even if the defendant does not kill the victim . . . , can be significant in the analysis of reckless indifference to human life." (*Ibid.*)

For the second *Clark* factor (presence at the scene and opportunity to prevent or mitigate the crime or aid the victim) (*Clark, supra*, 63 Cal.4th at p. 619), as previously discussed, not only was defendant present at the scene when Thornton was killed but he also actively pointed a gun at Thornton's passenger. It is reasonable to infer that his use of his gun, even if he did not fire it, stopped the passenger from helping Thornton. And defendant did nothing to stop the deadly attack. No evidence showed he told Pangthong to lower his weapon or not shoot; instead, he stood silently by with his gun drawn as Pangthong shot Thornton in the back of the head when Thornton attempted to escape the dangerous situation. Defendant, moreover, agreed with the group that Pangthong should carjack Thornton's red truck and did not object when Pangthong threatened to shoot the driver if he resisted or attempted to run away.

For the fourth *Clark* factor (knowledge codefendant was likely to kill) (*Clark, supra*, 63 Cal.4th at p. 621), defendant's close proximity to the murder and the events leading up to it are relevant as to whether defendant was aware of the likelihood Pangthong might kill their intended target. Again, Pangthong asked for defendant's loaded and operable weapon because Pangthong wanted to be the shooter and told the group he intended to shoot if there was resistance. Given this evidence, it may be

20

inferred that such conduct and statements reasonably suggested to defendant that Pangthong was willing to use lethal force. Rather than acting as a restraining influence on the younger Pangthong, however, defendant did nothing to prevent the situation and instead willingly gave Pangthong a loaded and operable firearm to use in the carjacking.

The final *Clark* factor (minimizing the risks of violence during the felony) (*Clark, supra*, 63 Cal.4th at pp. 621-622) also weighs against defendant. There is nothing in the record indicating that defendant did anything to lessen the risk of violence during the crime. Rather, as the trial court recognized, defendant's actions of arming Pangthong with a loaded and working weapon and using a second gun to subdue the victims during the attempted carjacking escalated the dangerousness of the encounter and heightened the risk of violence to Thornton.

To the extent defendant argues that different inferences more favorable to him can be drawn from the evidence, defendant misapprehends the applicable sufficiency of the evidence standard of review on appeal. Defendant cannot successfully challenge the sufficiency of the evidence merely by offering "competing inferences he wishes the [trial court] had drawn." (*People v. Casares* (2016) 62 Cal.4th 808, 827, disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

Accordingly, we conclude from the totality of the evidence and reasonable inferences from the evidence that substantial evidence supports the trial court's findings that defendant was a major participant who acted with reckless indifference to human life.

## III.  DISPOSITION

The order denying the petition is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

EARL, P. J.

/S/

_____

DUARTE, J.

22